**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| **Danny DeJesus**, <br><br> *Plaintiff*, <br> v. <br><br> **National Credit Adjusters, LLC,** *and* **Lee Tyler Rempel**, <br><br> *Defendants*. | Case No.: 8:21-cv-2147 <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**COMES NOW** the Plaintiff, **Danny DeJesus** ("**Mr. DeJesus**"), by and through his attorneys, Seraph Legal, P.A., and complains of the Defendants, **National Credit Adjusters, LLC ("NCA")** and **Lee Tyler Rempel** ("**Rempel**") (jointly "**Defendants**"), stating as follows:

**PRELIMINARY STATEMENT**

1. This is an action brought by Mr. DeJesus against the Defendants for violations of the Florida *Civil Remedies for Criminal Practices Act*, Florida Statute § 772.101, *et. seq.* ("**CRCPA**"), the *Florida Consumer Collection Practices Act*, Florida Statute § 559.55, *et. seq.* ("**FCCPA**") and the *Fair Debt Collection Practices Act*, 15 U.S.C. § 1692, *et. seq.* ("**FDCPA**").

## JURISDICTION AND VENUE

2. Subject matter jurisdiction for Plaintiff's FDCPA claims arises under the FDCPA, 15 U.S.C. § 1692k(d), and 28 U.S.C. § 1331, as the FDCPA is a federal statute.

3. This Court has supplemental jurisdiction for Plaintiff's CRCPA and FCCPA claims under 28 U.S.C. § 1367.

4. The Defendants are subject to the jurisdiction of this Court pursuant to Section 48.193, Florida Statutes and Fed. R. Civ. P. 4(k).

5. Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. §1391(b)(2), because the acts complained of were committed and / or caused by the Defendants within the Middle District of Florida

## PARTIES – Mr. DeJesus

6. **Mr. DeJesus** is a natural person who at all times relevant has resided in Tampa, Hillsborough County, Florida.

7. Mr. DeJesus is a *Consumer* as defined by 15 U.S.C. § 1692a(3) and Florida Statute § 559.55(8).

## PARTIES – NCA

8. NCA is a Kansas limited liability company with a principal business address of **327 W 4th Street, Hutchinson, KS 67501.**

9. NCA is registered to conduct business in the State of Florida, where its registered agent is **Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.**

## Parties-- Rempel

10. Rempel is the CEO and manager of NCA.

11. In his capacity as manager, Rempel is the individual responsible for the determination of, and implementation of, NCA's policies and procedures.

12. Rempel also participates directly in the day-to-day operations of NCA, including the collection of consumer debts and the purchase of consumer debts.

13. Upon information and belief, Rempel resides at **23 Prairie Dunes Dr., Hutchinson, KS 67502.**

14. The Defendants are "debt collectors" within the meaning of the FDCPA, 15 U.S.C. § 1692a(6), and the FCCPA, Fla. Stat. § 559.55(7), in that the Defendants use an instrumentality of commerce, including the U.S. mail and / or telephone, interstate and within the state of Florida, for their business, the principal purpose of which is the collection of debts, and / or they regularly collect or attempt to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15. NCA is licensed to collect consumer debts in the State of Florida, as a *Consumer Collection Agency* ("**CCA**").

## FACTUAL ALLEGATIONS

### Rise Makes Illegal Loan to Mr. DeJesus

16. In or around July 2019, Mr. DeJesus obtained an installment loan (the "**Rise Loan**") from the online lender Elevate Credit, Inc., doing business as Rise Credit ("**Rise**").

17. The Rise Loan had a stated principal of $4,000.

18. The Rise Loan was, purportedly, funded through **FinWise,** a small, single-branch bank in Murray, Utah (the "**Debt**").[1]

19. Mr. DeJesus used the proceeds of the loan for household expenses.

20. The Rise Loan arose from the purchase of goods and services which were primarily for family, personal, or household purposes, specifically charges for consumer goods and services, and therefore meets the definition of *Debt* under the FDCPA, 15 U.S.C. § 1692a(5) and the FCCPA, Florida Statute § 559.55(6).

21. Florida Statute § 687.071(2) renders loans made with annual interest rates greater than 25% a second-degree misdemeanor.

22. Florida Statute § 687.071(3) renders loans made with annual interest rates greater than 45% a third-degree felony.

---

[1] The bank has a small office in Sandy, UT and Garden City, NY, but has no retail branches at these locations.

23. Florida Statute § 687.071(7) renders any loan in violation of Florida Statute § 687.701, and any debt stemming from such extension of credit, void and unenforceable.

24. The annual interest rate on the Rise Loan exceeded **115% annually**.

25. The loan made by Rise to Mr. DeJesus was thus *void ab initio*. See *Stubblefield v. Dunlap*, 148 Fla. 401, 4 So.2d 519 (1941); *Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *River Hills, Inc. v. Edwards*, 190 So.2d 415 (Fla. 2d DCA 1966). *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935) (criminally usurious loans are "void as against the public policy of the state as established by its Legislature.")

26. The Rise loan is therefore an "unlawful debt" per Florida Statute § 772.102(2).

27. Florida law prohibits any recovery of the principal on such loans. *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. Dist. Ct. App. 1988).

### Rise Engages in Rent-a-Bank Scheme with FinWise

28. Rise is a Fort Worth, Texas-based "FinTech" business which makes loans to consumers at interest rates illegal in the vast majority of states, including Florida.

29. One of the founders of Rise was Ken Rees ("**Rees**") who was, until his resignation in July 2019, also its CEO.

30. Rees was previously the CEO of Think Finance, LLC ("Think Finance"), which made consumer loans at triple-digit interest rates.

31. Initially, Think Finance "partnered" with the First Bank of Delaware to launder its loans to create the appearance they were issued by a state-chartered bank, to avoid state usury laws.

32. In 2012, the First Bank of Delaware was later stripped of its bank charter and fined $15 million.

33. Rees thereafter partnered with the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation in Box Elder, Montana and began laundering its loans – now re-branded "Plain Green Loans" – through the Tribe, claiming the Tribe's sovereign immunity prevented civil and criminal action from being taken against it. Such agreements are often referred to as "rent-a-tribe" schemes.

34. Plain Green's loans charged interest rates of up to 400% annually.

35. After lawsuits filed against Think Finance by the Consumer Financial Protection Bureau, the Pennsylvania Attorney General, and others, relating to the wildly-usurious interest rates being charged by Plain Green, Rees formed **Elevate Credit, Inc.**

## Rise's Business Model

36. In an effort to avoid state usury laws, such as Florida's, Rise has "partnered" with FinWise, a single-branch bank chartered in Utah.

37. FinWise, as a bank, is not subject to state interest rate limits pursuant to the National Bank Act

38. Further, Utah has no maximum legal interest rate enshrined in its state law.

39. Rise "launders" its loans through FinWise, claiming that FinWise is the true lending entity.

40. However, FinWise was not the true lender of Mr. DeJesus' loan.

41. Indeed, FinWise had virtually nothing to do with the marketing, underwriting, servicing, collection, and post-charge-off sale to defendant NCA.

42. Moreover, at no point was any of FinWise's own capital actually at risk.

43. FinWise is only paid a small portion for its role in Rise's lending.

44. At all times relevant, Elevate EF SPV ("**EF SPV**") a Cayman Islands special purpose vehicle which operates for the financial benefit of Elevate Credit, had purchased a 96% interest in the receivables for the loans, including principal and interest due.

45. This 96% interest makes EF SPV the legal and equitable owner of the receivables for the loans.

46. Elevate Credit is the primary beneficiary of EF SPV, and receives the income generated from this 96% ownership interest.

47. Elevate Credit substantially controls and manages EF SPV and absorb its losses, should any be incurred.

48. Elevate Credit is the entity whose capital is at risk if a particular consumer loan goes bad.

49. FinWise contributes, at absolute maximum, 4% of the capital of any consumer loan.

50. Thus, FinWise contributed $160 or less to fund Mr. DeJesus' loan, while Elevate Credit contributed $3,840 or more.

51. Elevate Credit provides credit protection to EF SPV against Rise loan losses. This credit protection places the risk of losses on Elevate Credit.

52. Conversely, FinWise's economic interests are protected due to its agreement with Elevate Credit, which includes a stipulation that EF SPV maintain cash collateral in a FinWise account to secure its obligations to purchase the Rise loans supposed made "by" FinWise.

53. Elevate Credit, through ones of its subsidiaries, also acts as the servicer for the Rise loans. Elevate Credit reconciles the accounts, posts payments and other credits to the accounts, and provides periodic billing statements to consumers.

54. As per Rise's business model, once FinWise "made" the $4,000 loan to Mr. DeJesus, the loan was immediately assigned to Rise.

55. Rise then proceeded to attempt to collect the loan – including the usurious interest – from Mr. DeJesus.

56. However, Rise, a non-bank assignee of the Rise Loan, had no legal ability to collect the assessed interest. *See*. *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015).

57. Rise, not FinWise, is the true lender of Mr. DeJesus' purported loan, because it has the predominant economic interest in loans made to consumers like Mr. DeJesus. *See Fulford v. Marlette Funding, LLC,* No. 17CV30376 and *Fulford v. Avant of Colorado, LLC*, No. 17CV30377 (Colo. Dist. Ct. Denver County Aug. 13, 2018); see also, e.g., *State Bank v. Strong*, 651 F.3d 1241 (11th Cir. 2011); Easter v. Am. W. Fin., 381 F.3d 948, 957 (9th Cir. 2004); *CFPB v. CashCall, Inc.,* No. CV 15-7522-JFW (RAOx), 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016); *Penn v. Think Fin., Inc.*, No. 14-cv-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016); *Goleta Nat'l Bank v. Lingerfelt*, 211 F. Supp. 2d 711 (E.D. N.C. 2002); *CashCall, Inc. v. Morrisey*, No. 12-1274, 2014 WL 2404300 (W. Va. May 30, 2014) (memorandum decision); *Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190 (N.D. Cal. 2012); and *Eul v. Transworld Sys.*, No. 15 C 7755, 2017 WL 1178537 (N.D. Ill. Mar. 30, 2017).

58. <u>Any</u> amount repaid on an illegal, usurious debt deemed *void ab initio* by state law constitutes unjust enrichment, even if less than the original amount of the loan. See, e.g., *Williams et al. vs. Big Picture Loans, LLC*, case 3:17-cv-461, E.D. Virginia, July 20, 2021.

59. Rise has been sued in the past for collection of unlawful debt and its use of FinWise in its "rent-a-bank" schemes. *See District of Columbia vs. Elevate Credit, Inc.*, case 1:2020cv01909, U.S.D.C., District of Columbia, July 2, 2020.

### NCA Attempts to Collect Usurious Rise Loan from Mr. DeJesus

60. Mr. DeJesus made at least $1,460 of payments on the Rise Loan after obtaining the loan in July 2019.

61. By March 2020, Rise claimed Mr. DeJesus owed $5,112 - $1,112 more than he originally borrowed several months earlier – despite already having made at least $1, 406 of payments in the first 12 months of the loan.

62. Around March 2020, Rise sold the Rise Loan to NCA.

63. NCA, pursuant to 15 U.S.C. § 1692g, thereafter mailed Mr. DeJesus a collection letter, seeking to collect the Rise Loan.

64. NCA also reported the purported "debt" to the major consumer credit reporting agencies ("CRAs"), including Experian, monthly, beginning May 2020. **SEE PLAINTIFF'S EXHIBIT A.**

65. Reporting a debt to a CRA is an attempt to collect the debt alleged therein. *See, e.g., Edeh v. Midland Credit Management, Inc.,* 748 F. Supp. 2d 1030 (D. Minn. 2010) ("The Court has learned, through its work on countless FDCPA cases, that threatening to report and reporting debts to CRAs is one of the most commonly-used arrows in the debt collector's quiver.")

66. NCA certified to the CRAs that the debt it was reporting as "in collection," with $5,112 past due, thereby indicating that the Rise Loan was a legitimate, lawful debt.

67. NCA knew, or should have known, that it was collecting illegal debt from Mr. DeJesus.

68. NCA is a large debt buyer with a number of experienced lawyers advising it on consumer protection statutes.

69. Further, NCA has been subject to multiple actions by state regulatory authorities over its attempts to collect on illegally-issued consumer loans.

70. For example, NCA was sued in July 2012 by the Arkansas State Attorney General for collecting on payday loans issued to Arkansas consumers in violation of Arkansas law. As part of settlement with the Attorney General, NCA cancelled collection on $2.7 million in loans, and paid $200,000 to the State.

71. In November 2014, NCA was named as a co-defendant in a lawsuit by the Pennsylvania Attorney General filed against several internet-based payday

loan lenders claiming affiliation with Native American tribes. The suit claims the loans are illegal under Pennsylvania law and alleges NCA attempted to collect many of these payday loans, despite knowledge such loans were illegal under state law.

72. In January 2015, NCA settled with the New York City Department of Consumer Affairs, in which it agreed to pay $962,800 in consumer restitution to over 4,000 residents of New York City that it had collected payment from loans it purchased from unauthorized payday loan lenders. It also paid a $350,000 fine and was banned from collecting debt in New York City for six years.

73. Close to 100 other lawsuits have been filed against NCA for its collection of consumer loans made under illegal terms.

74. NCA purchases a large amount of unlawful debt from lenders including Rise, at a tiny fraction of face value, and then attempts to collect the full-face value those debts from consumers like Mr. DeJesus.

75. Beyond this, NCA was in possession of the original loan agreement documents creating the Debt.

76. On information and belief, the usurious interest rate was printed in large, bold type on the Truth in Lending Act ("TILA") disclosure.

77. Mr. DeJesus suffered severe emotional distress in being subjected to illegal collection actions over a loan by NCA which he, pursuant to Florida law, does not owe.

78. Mr. DeJesus' credit reports and scores have been severely and adversely negatively impacted from NCA's false reporting that he legitimately owes a debt in excess of $5,112 to NCA.

79. At all times relevant, Rempel, as CEO of NCA, instructed his agents and employees to attempt to collect the Rise Loan from Mr. DeJesus.

80. At all times relevant, Rempel, as CEO of NCA, authorized the purchase of bulk portfolios of debt from lenders including Rise, despite knowing the loans had been made at triple-digit interest rates through dubious "rent-a-bank" schemes.

81. Remple, in his capacity as CEO of NCA, was responsible for implementing NCA's aforementioned collection policies.

82. Remple, personally, is thus jointly and severally liable for the actions of NCA and its agents taken pursuant to the policies he put in place and had authority to control. *See Fed. Trade Comm'n v. Primary Grp., Inc.,* No. 16-13532, at *3 n.2 (11th Cir. Sep. 29, 2017).

83. Mr. DeJesus has hired the aforementioned law firm to represent him in this matter and has assigned his right to fees and costs to such firm.

## COUNT I
## VIOLATIONS OF THE FDCPA

84. Mr. DeJesus adopts and incorporates paragraphs 1 –83 as if fully stated herein.

85. The Defendants violated **15 U.S.C. § 1692e and 1692e(10)** when NCA used misleading and deceptive means to attempt to collect a debt by attempting to collect the Debt from Mr. DeJesus, a Florida resident, both in writing and via credit reporting, claiming a Debt from an unlicensed, non-bank entity, Rise, bearing annual interest exceeding 115%, was a legal, valid, and enforceable debt, when the Rise Loan was null, void, and unenforceable under Florida law.

86. The Defendants violated **15 U.S.C. § 1692e(2)(a)** when NCA made a false representation about the character, amount and/or legal status of a debt by attempting to collect from Mr. DeJesus, a Florida resident, both in writing and via credit reporting, a Debt from an unlicensed, non-bank entity, Rise, bearing annual interest exceeding 115%, was a legal, valid, and enforceable debt, when the Rise Loan was null, void, and unenforceable under Florida law.

87. The Defendants violated **15 U.S.C. § 1692e(8)** when NCA communicated credit information which was false, and which NCA knew, or should have known was false, to wit, that a Debt from an unlicensed, non-bank entity, Rise, bearing annual interest exceeding 115%, was a legal, valid, and enforceable debt, and that Mr. DeJesus thus actually owed the $5,112-plus balance,

when he did not owe it as it was null, void and unenforceable against him pursuant to Florida law.

88. The Defendants violated **15 U.S.C. § 1692f(1)** when NCA attempted to collect an amount not authorized by contract or law – to wit, the entire purported Rise Loan debt-- from Mr. DeJesus through written demands and credit reporting, when the Rise Loan was null, void, and unenforceable under Florida law.

89. The above stated violations were committed pursuant to policies put in place by Rempel and subject to his day-to-day oversight.

90. Rempel is therefore jointly and severally liable with NCA. *See Fed. Trade Comm'n v. Moses*, 913 F.3d 297 (2d Cir. 2019).

91. The Defendants' conduct renders them liable for the above-stated violations of the FDCPA.

**WHEREFORE,** Mr. DeJesus respectfully requests that this Honorable Court enter judgment against NCA and Rempel, jointly and severally, for:

   a. Statutory damages of **$1,000.00**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

   b. Actual damages, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

   c. Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

d.  Such other relief that this Court deems just and proper.

## COUNT II
## VIOLATIONS OF THE CRCPA

92. Mr. DeJesus adopts and incorporates paragraphs 1 – 83 as if fully stated herein.

93. The Defendants violated **Florida Statute § 772.103(3),** when they participated in an association with Elevate Credit, doing business as Rise Credit, through the collection of an unlawful debt – the Rise Loan.

94. The Defendants violated **Florida Statute § 772.103(4)** when they conspired and endeavored, with Rise and FinWise, to collect an unlawful debt – the Rise Loan – and to use any funds collected in furtherance of NCA's ongoing enterprise.

95. The Defendants took action in furtherance of this conspiracy, including mailing a collection letter and reporting it to the nationwide CRAs as a purported unpaid debt, damaging Mr. DeJesus' credit and, in effect, holding his credit report hostage until he paid the unlawful debt.

96. The Defendants have attempted to collect virtually-identical debts through credit reporting, phone calls, demand letters, and threats of litigation from hundreds, if not thousands, of other Florida residents.

**WHEREFORE,** Mr. DeJesus respectfully requests this Honorable Court enter judgment against NCA and Rempel, jointly and severally, ordering:

a. Threefold the amount of actual damages or, in the alternate, the statutory minimum of **$200**, whichever is greater, pursuant to Florida Statute 772.104(1);

b. Reasonable costs and attorneys' fees pursuant to pursuant to Florida Statute 772.104(1);

c. An injunction of Estoppel against NCA from engaging in any further action in violation of Florida law, pursuant to Florida Statute 772.14; and,

d. Any other relief this Court deems equitable and proper under the circumstances.

## COUNT III
## VIOLATIONS OF THE FCCPA

97. Mr. DeJesus adopts and incorporates paragraphs 1 – 83 as if fully stated herein.

98. The Defendants violated Section **559.72(9)**, Florida Statutes, when NCA attempted to collect the Rise Loan from Mr. DeJesus via multiple collection letters mailed to him, when the Rise Loan was illegitimate and unenforceable due to the application of interest rates in excess of 115% percent annually on the principal amount of the loan, in violation of Section 687.071, Florida Statutes, and NCA knew, or should have known, that the Rise Loan was unenforceable in Florida.

99. The Defendants violated Section **559.72(9)**, Florida Statutes, when NCA asserted rights which do not exist, specifically, the right to collect the Rise Loan from Mr. DeJesus, when the loan was not legally owed pursuant to Florida law.

100. NCA was in possession of the original loan documents and thus knew, or should have known, that the loan contained an illegal interest rate in Florida.

101. The above stated violations were committed pursuant to policies put in place by Rempel and subject to his day-to-day oversight.

102. Rempel is therefore jointly and severally liable with NCA. *See Fed. Trade Comm'n v. Moses*, 913 F.3d 297 (2d Cir. 2019).

103. **WHEREFORE,** Mr. DeJesus respectfully requests this Honorable Court enter judgment against NCA for:

    a. Statutory damages of **$1,000.00** pursuant to Section 559.77(2), Florida Statutes;

    b. Actual damages pursuant to Section 559.77(2), Florida Statutes;

    c. Punitive damages pursuant to Section 559.77(2), Florida Statutes;

    d. Injunctive relief preventing NCA from attempting to collect the alleged loan from Mr. DeJesus pursuant to Section 559.77(2), Florida Statutes;

 e. Reasonable costs and attorney's fees pursuant to pursuant to Section 559.77(2), Florida Statutes; and,

 f. Such other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Mr. DeJesus hereby demands a trial by jury on all issues so triable.

Respectfully submitted on September 9, 2021, by:

**SERAPH LEGAL, P. A.**

*/s/ Thomas M. Bonan*
Thomas M. Bonan Esq.
Florida Bar No.: 118103
TBonan@SeraphLegal.com
1614 N 19th Street
Tampa, Florida 33605
Tel: 813-567-1230
Fax: 855-500-0705
*Counsel for Plaintiff*

## ATTACHED EXHIBIT LIST

A Mr. DeJesus' Experian Consumer Disclosure, Dated July 12, 2021 – The NRA Tradeline - Excerpt